UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X
ALEX MAKAROUNIS,                                :
                                                                    :
                    Plaintiff,                          :          CASE NO.: _____
                                                                    :
          -against-                                    :          COMPLAINT
                                                                    :
TIVO CORPORATION, DAVID SHULL,    :          DEMAND FOR JURY TRIAL
JAMES E. MEYER, RAGHAVENDRA RAU,  :
LAURA J. DURR, ALAN L. EARHART,        :
EDDY W. HARTENSTEIN, DAN               :
MOLONEY, GLENN W. WELLING, and   :
LORIA B. YEADON,                              :
                                                                    :
                    Defendants.                      :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -  X

Plaintiff Alex Makarounis ("Plaintiff"), by and through his attorneys, alleges the following

upon information and belief, including investigation of counsel and review of publicly-available

information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal

knowledge:

## NATURE OF THE ACTION

1.      This is an action brought by Plaintiff against TiVo Corporation ("TiVo" or the

"Company") and members of the Company's executive officers and board of directors

(collectively referred to as the "Board" or the "Individual Defendants" and, together with TiVo,

the "Defendants") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act

of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a), 78t(a) respectively, and United States Securities

and Exchange Commission ("SEC") Rule 14a-9, 17 C.F.R. § 240.14a-9. Plaintiff's claims arise in

connection with the proposed combination of TiVo and Xperi Corporation ("Xperi"), into XRAY-

TWOLF HoldCo Corporation ("HoldCo") (the "Proposed Transaction").

//

1

2.      On December 18, 2019, TiVo entered into an Agreement and Plan of Merger, as amended on January 31, 2020 (the "Merger Agreement"), by and among TiVo, Xperi, Holdco, Xray Merger Sub Corporation ("Xperi Merger Sub", a Delaware corporation and a wholly owned subsidiary of HoldCo), and Twolf Merger Sub Corporation ("TiVo Merger Sub", also a Delaware corporation and a wholly owned subsidiary of HoldCo). Pursuant to the Merger Agreement: (i) Xperi Merger Sub will be merged with and into Xperi, with Xperi surviving the merger as a subsidiary of HoldCo, and (ii) TiVo Merger Sub, will be merged with and into TiVo, with TiVo surviving as a subsidiary of HoldCo. As a result, HoldCo will become the ultimate parent of Xperi, TiVo and their respective subsidiaries.

3.      Under the terms of the Merger Agreement, each shareholder of TiVo common stock will be entitled to receive 0.455 shares of HoldCo common stock, with cash paid in lieu of fractional shares of HoldCo common stock (the "Merger Consideration").  As a result, following consummation of the Proposed Transaction, it is expected that Xperi stockholders will own approximately 46.5% of HoldCo common stock and TiVo stockholders will own approximately 53.5% of HoldCo common stock.

4.      On February 18, 2020, in order to convince TiVo's public common stockholders to vote in favor of the merger, the Board authorized the filing of a materially incomplete and misleading Joint Registration Statement on Form S-4 (the "Registration Statement") with the SEC. The Registration Statement contains materially incomplete and misleading information concerning: (i) the *Background of the Merger* section; (ii) forecasts prepared by the management of both TiVo and Xperi; (iii) the valuation analyses performed by Centerview Partners LLC ("Centerview") and LionTree LLC ("LionTree"), in support of their fairness opinions; and (iv) information concerning LionTree's conflicts of interest.

5.      The shareholder vote will be scheduled in the coming weeks, as the Proposed Transaction is set to close in the second quarter of 2020 (the "Shareholder Vote"). It is imperative that the material information which has been omitted from the Registration Statement is disclosed to the Company's stockholders prior to the Shareholder Vote so they can properly determine whether to vote for or against the Proposed Transaction.

6.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9. Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to TiVo's public common shareholders sufficiently in advance of the upcoming Shareholder Vote or, in the event the Proposed Transaction is consummated, to recover damages resulting from the Defendants' violations of the Exchange Act.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.

9.      Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over each Defendant by this Court permissible under the traditional notions of fair play and substantial justice.  "Where a federal statute such as Section 27 of the [Exchange] Act confers nationwide service of process, the question becomes whether the party has sufficient contacts with the United States, not any particular state." *Sec.*

*Inv'r Prot. Corp. v. Vigman*, 764 F.2d 1309, 1315 (9th Cir. 1985).  "[S]o long as a defendant has minimum contacts with the United States, Section 27 of the Act confers personal jurisdiction over the defendant in any federal district court."  *Id.* at 1316.

10.    Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as 28 U.S.C. § 1391, because Defendants are found or are inhabitants or transact business in this District. Indeed, the Company's common stock trades on the Nasdaq, which is also headquartered in this District. *See, e.g., United States v. Svoboda*, 347 F.3d 471, 484 n.13 (2d Cir. 2003) (collecting cases).

## PARTIES

11.    Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of TiVo common stock.

12.    Defendant TiVo is a Delaware company with its principal executive office located at 2160 Gold Street, San Jose, California 95002. TiVo provides media and entertainment products for the consumer entertainment industry worldwide. TiVo's common stock trades on the Nasdaq under the ticker symbol "TIVO."

13.    Defendant Dave Shull is, and has been at all relevant times, the President, CEO, and a director of the Company.

14.    Defendant James E. Meyer is, and has been at all relevant times, the Chairman of the Board.

15.    Defendant Raghavendra Rau is, and has been at all relevant times, the Vice Chairman of the Board.

16.    Defendant Laura J. Durr is, and has been at all relevant times, a director of the Company.

17.     Defendant Alan L. Earhart is, and has been at all relevant times, a director of the Company.

18.     Defendant Eddy W. Hartenstein is, and has been at all relevant times, a director of the Company.

19.     Defendant Dan Moloney is, and has been at all relevant times, a director of the Company.

20.     Defendant Glenn W. Welling is, and has been at all relevant times, a director of the Company.

21.     Defendant Loria B. Yeadon is, and has been at all relevant times, a director of the Company.

22.     The defendants identified in paragraphs 13 through 21 are collectively referred to herein as the "Board" or the "Individual Defendants," and together with TiVo, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### A.  Background of the Proposed Transaction

23.     TiVo is an entertainment company, serving movies, shows and videos on live TV, on-demand, streaming services and numerous apps, for the benefit of individual consumers. For studios, networks and advertisers, TiVo delivers watchers to increase viewership and engagement across all screens.

24.     Xperi and its brands, DTS, FotoNation, HD Radio, Invensas and Tessera, create innovative technology solutions that enable a variety of experiences. Xperi's solutions are licensed in areas including premium audio, broadcast, automotive, computational imaging, computer vision, mobile computing and communications, memory, data storage, and 3D semiconductor interconnect and packaging.

25.     On December 19, 2019, TiVo and Xperi jointly announced the Proposed

Transaction. The press release stated as follows:

**Xperi and TiVo to Combine, Creating a Leader in Consumer &
Entertainment Technology and IP Licensing**

**Combination significantly enhances the scale and reach for each
business, provides opportunity for both revenue synergies and cost
savings**

**Combined product businesses will offer highly differentiated solutions
for home, automotive, and mobile markets**

**Strengthens and diversifies IP licensing businesses to drive strong,
recurring cash flow and long-term value creation**

SAN JOSE, Calif.--(BUSINESS WIRE)--Xperi Corporation (Nasdaq:
XPER) and TiVo Corporation (Nasdaq: TIVO) today announced they
entered into a definitive agreement to combine in an all-stock transaction,
representing approximately $3 billion of combined enterprise value. The
transaction creates a leading consumer and entertainment technology
business and one of the industry's largest intellectual property (IP) licensing
platforms with a diverse portfolio of entertainment and semiconductor
intellectual property.

The merger agreement provides for a 0.455 fixed exchange ratio, which
implies a 15% premium to TiVo's shareholders based on each of Xperi's
and TiVo's 90-day volume-weighted average share prices. At close, Xperi
shareholders will own approximately 46.5% of the combined business, and
TiVo shareholders will own approximately 53.5%.

**Compelling Benefits of Combining Two Innovative Product and IP
Licensing Leaders**

This transaction combines two technology pioneers who have shaped how
millions of consumers access and experience entertainment content, and
whose innovations are found in billions of devices around the world.
Serving hundreds of businesses ranging from content providers to consumer
electronics and automotive manufacturers, the combined entity will provide
an amazing entertainment platform for tens of millions of individual
consumers and create a powerful platform for the discovery, delivery, and
monetization of content.

The volume of entertainment content has exploded, with more ways than
ever before to access it. TiVo's leading content aggregation, discovery, and

recommendation capabilities enable viewers to more easily find, watch, and enjoy entertainment. When coupled with Xperi's strong presence and product capabilities in the home, automotive, and mobile device ecosystems, the combined company will have a unique industry platform to address an ever-increasing consumer desire to enjoy entertainment anywhere, anytime, on any device.

Additionally, the combination will create an intellectual property licensing platform that spans a number of the largest addressable markets in entertainment content, consumer electronics, and semiconductors. With more than 10,000 patents and applications between the two companies and minimal licensee overlap, the combined IP business will be one of the largest licensing companies in the world. Further, the combined business will benefit from greater research and development capabilities, as well as customer diversification.

"This landmark combination brings together two highly complementary companies poised to set the industry standard for user experiences across the digital value chain," said Jon Kirchner, Chief Executive Officer of Xperi. "Together, we will be able to integrate TiVo's leading content aggregation, metadata, discovery, and recommendation capabilities with our home, automotive, and mobile technology solutions to help our customers create experiences that excite and delight consumers. Additionally, the combined company will continue to unlock the value of our strategic and sizable patent portfolios by bringing together our deep industry expertise and powerful innovation engines. Through greater scale and diversity, we will deliver attractive and sustainable long-term cash flow and shareholder value."

"There is more content, and more ways to enjoy that content, than ever before," said David Shull, Chief Executive Officer of TiVo. "In a rapidly expanding and fragmenting digital universe, consumers want and need to be able to easily find and enjoy the content that matters to them. TiVo has always been the company that brings entertainment together. Now, we can significantly expand our mission. With Xperi's annual licensing of more than 100 million connected TV units, and complementary relationships with major content providers, consumer electronics manufacturers, and automotive OEMs, our combined company will transform the home, car, and mobile entertainment experience for the consumer."

**Long-Term Vision and Value Creation**

The first step in the combined company's value creation plan will focus on integrating the companies' respective product and IP licensing businesses. Together, the companies expect to benefit from a larger and stronger platform to drive growth and innovation, accelerate time-to-market, and

improve IP licensing monetization and outcomes. The product business expects to pursue substantial cross-selling opportunities especially in its home and automotive markets.

The new company had $1.09 billion in TiVo revenue and 1Xperi billings and more than $250 million in operating cash flow on a pro forma basis for the twelve months ended September 30, 2019. The combined company expects to deliver revenue synergies by bringing new, innovative solutions to consumer electronics and automotive companies to help address the massive shift in media and entertainment distribution and consumption.

Additionally, the companies expect to achieve at least $50 million of annualized run-rate cost savings by year-end 2021 through the integration of their respective product and IP licensing businesses, the majority of which are expected within the first twelve months after closing. These cost savings are incremental to those that are expected as a result of TiVo's ongoing cost-transformation plan.

In light of the business combination, TiVo has suspended its near-term plans to separate its product and IP businesses. Upon closing of the transaction, each company's respective product and IP businesses will be integrated and operated as separate IP licensing and product business units. This will facilitate a potential separation of the combined businesses at a later date.

David Shull said, "TiVo's management team and board have engaged in a comprehensive review of TiVo's businesses over the past year, and we are confident that this combination with Xperi is the right path forward for all our stakeholders. While we previously planned to separate our product and IP licensing businesses in April 2020, we believe today's combination with Xperi will enable us to create even more value for our shareholders in both the near and long term by allowing each to go to market with greater financial and operational scale."

**Transaction Details**

Under the terms of the merger agreement, the shares of TiVo and Xperi stockholders will be converted into the shares of the new parent company based on a fixed exchange ratio of 0.455 Xperi share per existing TiVo share. Upon completion of the merger, Xperi stockholders will own approximately 46.5% and TiVo stockholders will own approximately 53.5% of the new parent company on a fully diluted basis.

In connection with the transaction each company's debt will be refinanced on a combined basis. To meet this objective, the companies have secured $1.1 billion of committed financing from Bank of America and Royal Bank of Canada.

**Management and Board of Directors**

Following the completion of the transaction, Xperi's Chief Executive Officer, Jon Kirchner, will serve as Chief Executive Officer of the new parent company and Xperi's CFO, Robert Andersen, will serve as Chief Financial Officer. TiVo's Chief Executive Officer, David Shull, will continue as a strategic advisor to ensure a successful integration.

The Board of Directors of the new parent company will consist of seven directors, including Xperi CEO Jon Kirchner, in addition to three directors appointed by Xperi and three directors appointed by TiVo. The Chair of the Board will be selected by the independent directors of the Board.

The new parent company will assume the Xperi name but will continue to provide entertainment services under the TiVo brand, alongside Xperi's premium DTS®, HD Radio®, and IMAX® Enhanced brands. The company will be headquartered in San Jose, California.

26.     The Merger Consideration represents inadequate compensation for TiVo's shares. Therefore, it is imperative that shareholders receive the material information (discussed in detail below) that Defendants have omitted from the Registration Statement, which is necessary for shareholders to properly exercise their corporate suffrage rights and in order to cast an informed vote on the Proposed Merger.

**B.    The Preclusive Deal Protection Devices**

27.     To the detriment of TiVo shareholders, the Individual Defendants agreed, in the Merger Agreement, to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and all but ensure that the Proposed Transaction is consummated and that no competing offers emerge for the Company.

28.     The Merger Agreement contains a restrictive no solicitation provision that prohibits the members of the Board from soliciting any offer, inquiry, indication of interest or proposal relating to alternative offers or business combinations. Indeed, the no solicitation provision even prevents TiVo from waiving standstill provisions in existence prior to the Merger Agreement,

effectively precluding interested counterparties from making more lucrative offers.

29.     The no solicitation provision also prohibits, except under extremely limited circumstances, the Individual Defendants from engaging in discussions or negotiations relating to unsolicited proposals regarding alternative acquisitions or business combinations.

30.     Further, the Board must provide Xperi with written notice of any acquisition proposal by a third party and must provide prior written notice of that proposal within 24 hours of receiving it, the Board must also notify Xperi within 24 hours should the Board deem that the acquisition proposal constitutes a superior offer.

31.     In addition, the Merger Agreement provides that the Company will be required to pay to Xperi a termination fee of $50.8 million in the event that the Merger Agreement is terminated prior to shareholder approval.

32.     In fact, even before entering the Merger Agreement, the exclusivity agreement between Xperi and TiVo required the Company to ignore competing potential counterparties.

33.     Ultimately, these preclusive deal protection devices restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The aggregate effect of these preclusive deal protection devices, viewed in light of the materially inadequate consideration offered for TiVo shares in the Proposed Transaction, supports an inference that the Board was not acting in good faith in approving the terms of the Merger Agreement.

34.     Accordingly, Plaintiffs seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's shareholders will continue to suffer absent judicial intervention.

//

C. **The Registration Statement Omits Certain Material Information**

35.     On February 18, 2020, Defendants authorized the filing of a materially incomplete and misleading Registration Statement with the SEC. The Individual Defendants were obligated to carefully review the Registration Statement before it was filed with the SEC and disseminated to the Company's stockholders to ensure that it did not contain any material misrepresentations or omissions. However, the Registration Statement misrepresents or omits material information necessary for TiVo's shareholders to make an informed decision on how to vote their shares, in violation of Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9.

36.     ***First***, the Registration Statement is materially misleading regarding the no solicitation provision, which prevents other parties from offering a more lucrative deal. As indicated in the Registration Statement, both Xperi and TiVo entered into nondisclosure agreements with potential counterparties throughout 2019 regarding potential transactions. TiVo executed 26 of these nondisclosure agreements, while Xperi executed 11 of the same. Yet, the Registration Statement is silent as to whether those nondisclosures contained 'don't ask, don't waive' provisions ("DADW"), and whether those provisions have fallen away or remain in effect.

37.     The express communication of the existence of DADW provisions is material to TiVo stockholders, as it bears directly on the ability of parties who expressed interest in acquiring the Company to offer a better deal. Additionally, the Registration Statement is materially misleading because it characterizes the ability of counterparties to ask for a waiver in a false light. On page 12 of the Registration Statement, it states "Xperi and TiVo have each agreed…not to, directly or indirectly:…(iii)(A) amend or grant any waiver or release under any standstill or similar agreement with respect to any class of equity securities or any of its subsidiaries ***(other than provisions in those obligations customarily referred to as "don't ask" provisions)***" (emphasis

added). In plain English, this means Xperi and TiVo are restricted from waiving standstill provisions for their respective nondisclosure agreements, although counterparties may ask for a waiver. Yet, that is materially misleading. Any counterparty subject to a DADW provision, is restricted under their respective nondisclosure agreement from "asking" for a waiver.

38.     The failure to plainly disclose the existence of DADW provisions, and the misleading characterization that other counterparties could offer a better deal without breaching their respective nondisclosure agreement, creates the false impression that any of the parties who signed non-disclosure agreements could have made a superior proposal. If the non-disclosure agreements contained DADW provisions, then those parties could only make a superior proposal by breaching the agreement—since in order to make the superior proposal, they would have to ask for a waiver, either directly or indirectly. *Any reasonable shareholder would deem the fact that the most likely potential topping bidders in the marketplace may be precluded from making a superior offer to significantly alter the total mix of information.* Thus, the omission of this material information renders the descriptions of the non-disclosure agreements the Company entered into in the *Background of the Merger* section of the Registration Statement misleading.

39.     **Second**, the Registration Statement fails to fully and accurately disclose the management forecasts for both Xperi and TiVo.

40.     TiVo provides two different scenarios for its management forecasts for TiVo (on a "Stand-Alone, Pre-Merger Basis"). However, the Registration Statement fails to disclose which of these scenarios is more likely. It also omits the unlevered free cash flow projections for this forecast, along with which scenario LionTree relied on. Considering that Adjusted EBITDA varies in the scenarios by $105 million by the year 2022, it is absolutely critical that shareholders are informed of which scenario the bankers relied on and which scenario is more likely in order to

assess the fairness of the Merger Consideration.

41.     Similarly, Xperi created two different set of scenarios for its management forecasts. For undisclosed reasons Scenario A was not provided to TiVo, **even though Scenario B "was actively considered by Xperi management and the Xperi board as a means to evaluate [certain scenarios] in comparison to any potential alternative transaction**." Registration Statement at 98. Furthermore, it is undisclosed which set of projections Centerview relied on in preparing its fairness opinion, which is shocking considering Adjusted EBITDA under the Statement of Operation Items varies by $70 million by 2024. Registration Statement at 101.

42.     Increasing the severity of the misstatements in the Registration Statement, it appears that TiVo went ahead and slashed Xperi's projections, without providing any explanation for doing so. As stated before, Xperi only provided the Scenario A forecasts to TiVo. Registration Statement at 98. TiVo then inexplicably created the TiVo Adjusted Xperi forecasts to assist the TiVo Board in its evaluation of the quantitative and strategic rationale for the mergers. The resulting forecasts, **slash Billings by $310 million by the year 2024**, without any explanation for doing so. As seen below:

*On page 101 of the Registration Statement, Scenario A:*

|  | **2020E** | **2021E** | **2022E** | **2023E** | **2024E** |
|---|---|---|---|---|---|
| Billings | $ 461 | $ 417 | $ 548 | $ 708 | $ 824 |
| Adjusted EBITDA | $ 231 | $ 162 | $ 253 | $ 350 | $ 371 |

*On page 110 of the Registration Statement, Adjusted Xperi Forecasts:*

|  |  |  |  |  |  |
|---|---|---|---|---|---|
| Billings | $ 390 | $ 350 | $ 402 | $ 493 | $ 514 |
| Adjusted EBITDA | $ 164 | $ 111 | $ 156 | $ 220 | $ 213 |

43.     If a company chooses to disclose projections, it obligates itself to do so in a complete and accurate manner, and it may not cherry-pick certain metrics to disclose while withholding other readily available sets of projections from stockholders. *See Smith v. Robbins &*

*Myers*, 969 F. Supp. 2d 850, 874 (S.D. Ohio 2013) ("[I]f a Proxy discloses valuation information, it must be complete and accurate."); *Brown v. Brewer*, 2010 U.S. Dist. LEXIS 60863, at *69-71 (C.D. Cal. June 17, 2010) (same); *see also Azar v. Blount Int'l, Inc.*, No. 3:16-cv-483-SI, 2017 U.S. Dist. LEXIS 39493, at *16 (D. Or. Mar. 20, 2017) ("The established case law shows the importance (and, hence, materiality) of financial projections to shareholders' decision-making."). As the Sixth Circuit explained: "with regard to future events, uncertain figures, and other so-called soft information, a company may choose silence or speech elaborated by the factual basis as then known—but it may not choose half-truths." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001).

44.     **Third**, the Registration Statement fails to provide shareholders with complete and accurate information concerning the fairness opinions created by Centerview and LionTree.

45.     With respect to Centerview's *Selected Public Company Analyses* for both TiVo and Xperi, a fair summary requires full disclosure of the following: (i) the objective criteria Centerview considered in selecting the public companies, and (ii) the enterprise values for each of the selected public companies. Likewise, for LionTree's *Selected Publicly Traded Companies Analyses* for both TiVo and Xperi, the same must be disclosed. Merely providing the values that a banker calculated is insufficient, as stockholders are unable to assess whether the banker utilized reasonable comparable companies, or, instead, selected unreasonable companies in order to make the Proposed Transaction appear more favorable. The failure to disclose such information further prevents TiVo shareholders from making an informed decision as to whether to vote in favor of the Proposed Transaction.

46.     With respect to Centerview's *Sum-of-the-Parts Discounted Cash Flow Analysis-TiVo*, the Registration Statement fails to provide certain key inputs and assumptions necessary for

shareholders to evaluate whether the implied ranges are a fair analysis of TiVo. First, in evaluating TiVo's IP licensing business, the Registration Statement omits: (i) the implied terminal value; (ii) the inputs and assumptions behind selecting perpetuity growth rates ranging from (2.0%) to 0.0%; (iii) the assumptions behind selecting a discount range of 9.25% to 11.00%; and (iv) Centerview's analysis of TiVo's cost of capital. Second, concerning TiVo's product business, the Registration Statement further omits: (i) the implied terminal value; (ii) the inputs and assumptions behind selecting perpetuity growth rates ranging from 1.0 to 2.0%; (iii) the assumptions behind selecting a discount range of 8.00% to 9.50%; and (iv) Centerview's analysis of TiVo's cost of capital. Third, concerning TiVo's net operating losses, the Registration Statement omits the actual projections of the net operating losses and the assumptions behind using a discount rate range of 9.25% to 11.00%. Finally, the Registration Statement omits the implied enterprise values based off these three analyses used to derive the implied equity values.

47.    With respect to Centerview's *Sum-of-the-Parts Discounted Cash Flow Analysis-Xperi*, again the Registration Statement fails to provide certain key inputs and assumptions necessary for shareholders to evaluate whether the implied share ranges are a fair analysis of Xperi. First, in evaluating Xperi's IP Licensing Business, the Registration Statement omits: (i) the implied terminal value; (ii) the inputs and assumptions behind selecting perpetuity growth rates ranging from (4.0)% to 0.0%; (iii) the assumptions behind selecting a discount range of 9.5% to 11.25%; (iv) Centerview's analysis of Xperi's cost of capital; and (v) the reasons why Centerview relied upon Scenario B instead of Scenario A. Second, in evaluating Xperi's Product Licensing Business, the Registration Statement omits: (i) the reasons for selecting an implied terminal value in 2029; (ii) the inputs and assumptions behind applying a perpetuity growth rate ranging from 1.0% to 2.0%; and (iii) the reasons for selecting a discount rate range of 9.5% to 11.25%. Third, concerning

Xperi's New Product Line, the Registration Statement omits: (i) the reasons for selecting an implied terminal value in 2029; (ii) the inputs and assumptions behind applying a perpetuity growth rate ranging from 3.0% to 5.0%; and (iii) the reasons for selecting a discount rate range of 15.0% to 18.0%.

48.     In addition, the Registration Statement omits the reason why Centerview's implied values for share of Xperi varied so drastically. From the Scenario A calculations Centerview arrived at an implied value per share range of Xperi common stock of approximately $37.10 to $53.45. Likewise, from the Scenario B calculations, Centerview arrived at an implied value per share range of $29.85 to $41.65. This is a drastic range in values and allows Defendants to place any value on Xperi necessary to be able to justify the unfair Merger Consideration.

49.     Similarly, with respect to LionTree's *Sum-of-the-Parts Discounted Cash Flow Analysis* for TiVo, the Registration Statement fails to provide certain key inputs and assumptions necessary for shareholders to evaluate whether the implied share ranges are a fair analysis of the Company. Concerning ProductCo, the Registration Statement omits: (i) the terminal values; (ii) the inputs and assumptions behind applying a range of terminal multiples of 8.0x to 10.0x; (iii) the assumptions behind applying discount rate ranges of 9.0% to 11.0%; and (iv) TiVo's estimated weighted average cost of capital. Concerning IPCo, the Registration Statement omits: (i) the inputs and assumptions behind apply terminal multiples of 4.75x to 5.75x; (ii) the terminal values; (iii) the assumptions behind selecting a discount range of 9% to 11%; (iv) the estimated weighted average cost of capital; and (v) the enterprise value illustrative range. For both lines of business, the Registration Statement provides that discount rates were derived using the capital asset pricing model but fails to provide those company-specific inputs so that shareholders may replicate the analysis, including: TiVo's target capital structure weightings, the cost of long-term debt, future

applicable marginal cash tax rate and a beta for TiVo, as well as certain financial metrics for the United States financial markets generally. LionTree also fails to explain how the implied share prices between including versus excluding the litigation opportunity differ so drastically, and fail to state which is the more likely scenario.

50.     Likewise, with respect to LionTree's *Sum-of-the-Parts DCF Analysis* for Xperi, for each of the lines of business the Registration Statement omits: (i) the terminal value of future cash flows in subsequent years; (ii) inputs and assumptions for applying terminal multiples of 9.0x to 11.0x; (iii) inputs behind calculating the range of terminal multiples of 3.0x to 5.0x; (iv) assumptions behind selecting discount rates ranging from 8.75% to 10.75%; and (v) company-specific inputs used in calculating the discount rates, including the company's target capital structure weightings, the cost of long-term debt, after-tax yield on permanent excess cash, if any, future applicable marginal cash tax rate and a beta for the company, as well as certain financial metrics for the United States financial markets generally. Most importantly, LionTree fails to state why it used the Adjusted Xperi Forecasts instead of forecasts created by Xperi, and if it and TiVo believed Xperi's forecasts were unreliable.

51.     Courts across the country have ruled that this information is material to shareholders. The inputs and assumptions underlying the values calculated in a discounted cash flow analysis are material to shareholders, because they must decide for themselves whether such calculations were appropriate. *See Smith v. Robbins & Myers*, 969 F. Supp. 2d 850, 858 (S.D. Ohio 2013). The failure to disclose the inputs a banker uses in determining its discount rates "bears materially on the decision to be made by … stockholders." *Maric Capital Master Fund, Ltd. v. Plato Learning, Inc.*, 11 A.3d 1175, 1177-78 (Del. Ch. 2010) (enjoining the merger unless and until corrective discount rate disclosures were made). Inputs underlying discount rates are

important, because the DCFs based on faulty discount rates can make merger consideration look far more attractive than it would otherwise. *Id.* at 1177 (finding "based upon an analysis of PLATO Learning's weighted average cost of capital" to be insufficient disclosure). When a company speaks on this subject, there is a duty to do so in a non-misleading fashion. *Id.*

52.     As a highly-respected professor explained in one of the most thorough law review articles regarding the fundamental flaws with the valuation analyses bankers perform in support of fairness opinions – in a discounted cash flow analysis a banker takes management's forecasts, and then makes several key choices "each of which can significantly affect the final valuation." Steven M. Davidoff, *Fairness Opinions*, 55 Am. U.L. Rev. 1557, 1576 (2006).  Such choices include "the appropriate discount rate, and the terminal value…" *Id.*  As Professor Davidoff explains:

> There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. For example, a change in the discount rate by one percent on a stream of cash flows in the billions of dollars can change the discounted cash flow value by tens if not hundreds of millions of dollars…. This issue arises not only with a discounted cash flow analysis, but with each of the other valuation techniques. This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness.  This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.

*Id.* at 1577-78.

53.     ***Fourth and finally***, the Registration Statement fails to disclose whether LionTree was provided any compensation from Xperi and its affiliates for the Proposed Transaction. Furthermore, the Registration Statement fails to disclose whether Xperi or its affiliates provided any services to Xperi during the past two years and whether it received compensation for those

services, and should it have provided services, the timing and nature of those services.

54.     Disclosure of  any "relationship that existed during the past two years or is mutually understood to be contemplated *and any compensation received or to be received* as a result of the relationship between" a financial advisor and the subject company or its affiliates is required pursuant to 17 C.F.R. § 229.1015(b)(4) (emphasis added). Such information is undoubtedly material to TiVo shareholders. It is imperative for shareholders to be able to understand what factors might influence the financial advisor's analytical efforts. A financial advisor's own proprietary financial interest in a proposed transaction must be carefully considered when assessing how much credence to give its analysis. A reasonable shareholder would want to know what important economic motivations that the advisor, employed by a board to assess the fairness of the transaction to the shareholders, might have. This is especially true when that motivation could rationally lead the advisor to favor a deal at a less than optimal price, because the procession of a deal was more important to them—given their overall economic interest—than only approving a deal at truly fair price to shareholders.

55.     In sum, the omission of the above-referenced information renders the Registration Statement materially incomplete and misleading, in contravention of the Exchange Act.  Absent disclosure of the foregoing material information prior to the Shareholder Vote, Plaintiff will be unable to make an informed decision concerning whether to vote his shares, and he is thus threatened with irreparable harm, warranting the injunctive relief sought herein.

## COUNT I
**(Against All Defendants for Violation of Section 14(a) of the Exchange Act)**

56.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

//

57.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any Registration Statement or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title."  15 U.S.C. § 78n(a)(1).

58.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that Registration Statement communications shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.

59.     The omission of information from a Registration Statement will violate Section 14(a) and Rule 14a-9 if other SEC regulations specifically require disclosure of the omitted information.

60.     Defendants have issued the Registration Statement with the intention of soliciting the Company's common shareholders' support for the Proposed Transaction. Each of the Individual Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide critical information concerning: (i) DADW clauses; (ii) management forecasts; (iii) financial analyses conducted by the financial advisors; and (iv) LionTree's conflicts of interest.

61.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading.  Each of the Individual Defendants,

by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Individual Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Registration Statement, but nonetheless failed to obtain and disclose such information to the Company's shareholders although they could have done so without extraordinary effort.

62.     The Individual Defendants knew or were negligent in not knowing that the Registration Statement is materially misleading and omits material facts that are necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon most if not all of the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Registration Statement states that LionTree reviewed and discussed its financial analysis with the Board, and further states that the Board considered the financial analysis provided by LionTree, as well as the fairness opinion and the assumptions made and matters considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge of the projections for the Company and the details surrounding the process leading up to the signing of the Merger Agreement. The Individual Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading. Indeed, the Individual Defendants were required to, separately, review LionTree's analysis in connection with their receipt of the fairness opinions, question LionTree as to its derivation of fairness, and be particularly attentive to the procedures followed in preparing the Registration Statement and review it carefully before it was disseminated, to corroborate that there are no material

misstatements or omissions.

63.     The Individual Defendants were, at the very least, negligent in preparing and reviewing the Registration Statement. The preparation of a Registration Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence.  The Individual Defendants were negligent in choosing to omit material information from the Registration Statement or failing to notice the material omissions in the Registration Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Individual Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and preparation and review of the Company's financial projections.

64.     TiVo is also deemed negligent as a result of the Individual Defendants' negligence in preparing and reviewing the Registration Statement.

65.     The misrepresentations and omissions in the Registration Statement are material to Plaintiff, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the Shareholder Vote.  Plaintiff has no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II
**(Against the Individual Defendants for Violations of Section 20(a) of the Exchange Act)**

66.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

67.     The Individual Defendants acted as controlling persons of TiVo within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of TiVo, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the

Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

68.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Registration Statement contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were thus directly involved in preparing this document.

70.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

71.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

72.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

73.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily enjoining Defendants and all persons acting in concert with them from proceeding with the Shareholder Vote or consummating the Proposed Transaction, unless and until the Company discloses the material information discussed above which has been omitted from the Registration Statement;

B.     Directing the Defendants to account to Plaintiff for all damages sustained as a result of their wrongdoing;

C.     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

D.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

//

//

//

//

Dated: March 4, 2020

**MONTEVERDE & ASSOCIATES PC**

*/s/ Juan E. Monteverde*
Juan E. Monteverde (JM-8169)
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel:(212) 971-1341
Fax:(212) 202-7880
Email: jmonteverde@monteverdelaw.com

*Attorneys for Plaintiff*